UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Paula MacLeod


             v.                    Civil No. 09-cv-118-JD
                                   Opinion No. 2010 DNH 029

Reliance Standard
Life Insurance Company


O R D E R

     Paula MacLeod sued Reliance Standard Life Insurance Company
under the Employee Retirement Income Security Act of 1974
("ERISA"), 29 U.S.C. § 1132(a)(1)(B), seeking benefits under her
former employer's group long-term disability insurance policy.
After filing their Joint Statement of Material Facts, MacLeod and
Reliance Standard each filed a motion for judgment on the
administrative record.  MacLeod also seeks attorneys' fees and
court costs, as well as pre- and postjudgment interest on unpaid
benefits.

Background[1]

A.   Medical History

Paula MacLeod worked at Ear, Nose and Throat Specialists of Southern New Hampshire ("ENTS") as a pre-certification and scheduling coordinator from December 29, 2003, to February 7, 2007.  During that time, she became insured under a Reliance Standard group long-term disability ("LTD") insurance policy through ENTS.  In October 2006, MacLeod began to see Dr. Powen Hsu, a physical medicine and rehabilitation physician, for pain in her left hip.

During her visit with Dr. Hsu on October 11, MacLeod received an x-ray and an MRI on her hip, which revealed that the hip was not fractured, but was minimally degenerated and exhibited a large bony protuberance.[2]  AR at 335-37.  Dr. Hsu noted that MacLeod was discharged from the medical center because she was comfortable.  He also wrote, however, that she came into the office with a pain level of nine to ten out of ten, and that the pain interfered with her sleep.  Id. at 333.  Dr. Hsu wrote

_____

[1]The facts are taken from the parties' Joint Statement of Material Facts, as well as the Administrative Record ("AR").

[2]The Joint Statement of Material Facts, as well as the parties' motions, contain references to a host of medical terms without defining or explaining them.  The court refers, instead, to the lay terms used.

that MacLeod "had been doing well and continued to be working," but "[h]er knees buckled more than 40 times within a few hours," which caused her to fall.  Id. at 334.

Dr. Hsu saw MacLeod again on October 18, when he noted that she was in pain and experiencing "severe muscle spasms around her hip," but that she had full hip strength and range of movement. Id. at 346.  Upon her November 2 visit, Dr. Hsu noted MacLeod's pain level was minimal after an injection of cortisone.  Although he advised that she use a cane, MacLeod said she wanted to "hold off as long as possible."  Id. at 345.  Dr. Hsu thought that MacLeod had improved, and he had no new recommendations.

On January 11, 2007, Dr. Ivan Tomek, an orthopedic surgeon, evaluated MacLeod and reported that the hip showed mild to moderate degeneration, and that anti-inflammatory treatments and activity restriction had not resolved MacLeod's symptoms.[3]  Dr. Tomek recommended surgery to evaluate the problem and to cut off the bony protuberance.  On February 1, 2007, MacLeod visited Dr. Hsu again, who reported that her pain level was "7/10" and that she was "comfortable with waiting for her hip surgery on [sic] March."  Id. at 344.

---

[3]The Joint Statement refers to Dr. Tomek's first name as "Iva."  The Administrative Record reveals that his name is "Ivan."  See, e.g., AR at 296.

MacLeod stopped working on February 7, 2007.  On the same day, Dr. Tomek wrote that MacLeod would be undergoing surgery on March 14, and that she was "currently unable to work and [would] remain out of work for an estimated 2 weeks following her surgery."  Although MacLeod underwent surgery, and the doctors were able to evaluate her and give her an injection of morphine and other drugs, they did not cut off the bony protuberance.[4] Id. at 298.  In a follow-up with Dr. Hsu on March 21, he noted that MacLeod was referred to Boston for further surgery, her pain was not controlled, and that she was using a straight cane to walk.  Id. at 343.  He recommended that she remain out of work due to her pain medications.  Id.  Dr. Hsu's notes from April 19 show that MacLeod had "significant pain with ambulation and mobility," and that he told her not to work for a month.  Id. at 342.

Dr. Tomek referred MacLeod to Dr. Young-Jo Kim, an orthopedic surgeon, whom she saw on May 11, 2007.  Id. at 303. In his report, Dr. Kim noted that radiographs showed some calcification but that he did not see "any other evidence of bony

---

[4]Reliance Standard states that Dr. Hsu "incorrectly reported that plaintiff 'went in for hip surgery and [it] was unable to be performed.'"  Deft.'s Memo. at 3 (citing AR at 343).  It is unclear whether Dr. Hsu made a mistake or whether he was referring to the fact that the doctors did not cut off the bony protuberance.

4

pathology." Id. at 248.  Dr. Kim planned to perform a diagnostic injection and, if it succeeded, he would recommend further surgery.  Id.

On May 22, Dr. Hsu wrote that MacLeod was still unable to work, but that he would reexamine her in June.  He examined her on June 1, and noted a "severe increase in pain level after her hip injection," and that the pain had spread "over her shoulder joint, chest, abdomen, and both hips." Id. at 340.  He recommended a patient-controlled analgesia pump, but MacLeod said she would "try to endure the pain since it [was] expected to improve." Id.  After her June 28 visit, Dr. Hsu noted that Dr. Kim did not recommend surgery, and that although the pain was "non relenting" and the hip produced a popping sound with lateral movement, there was no redness or fluid accumulation.  Id. at 264.  A July 9 MRI, interpreted by Dr. David Hou, revealed mild degeneration of some bones in her lower back and that she probably also had several cysts on her kidneys and liver.  Id. at 269.

Around this time, her health insurance carrier apparently received a request to pre-approve physical therapy for MacLeod's hip.  By letter dated July 13, 2007, Harvard Pilgrim Health Care approved coverage for twenty-five visits between July 19 and October 16, 2007.  Id. at 185.  According to Reliance Standard's

internal record of a March 6, 2008, telephone conversation with MacLeod, she "advised she only went to [physical therapy] one time."  Id. at 92.

Dr. Hsu referred MacLeod to Dr. Ralph Beasley, to evaluate whether she would benefit from a spinal cord stimulator, an implanted device that blocks pain messages coming from the brain. Id. at 186.  During her visit on August 13, 2007, Dr. Beasley noted that her pain level averaged between seven and eight out of ten, and was "worse with sitting, but also with standing and walking."  Id.  Dr. Beasley also thought it was "[o]f significance [that] she has borderline diabetes, asthma, panic attacks and has some kidney problems and depression."  Id.  Upon examination, Dr. Beasley found that MacLeod "has very limited range of motion and extension is limited to maybe five degrees at the most[,] causing increased back pain."  Id.

Like other doctors, Dr. Beasley noted degeneration of the hip, and he also saw some arthritis.  Id. at 187.  He thought that MacLeod might have suffered nerve injury, and that it might be advisable to reconsider surgical intervention.  Id.  Dr. Beasley concluded that MacLeod was not a candidate for a spinal cord stimulator, and he suggested trying additional medications and pool therapy to help with her pain.  Id.  Most significantly, he noted that MacLeod "may not be able to do much with her hip

popping."  Id.  He confirmed that, just as the report of her
March surgery said, there was certainly something wrong with her
hip.  Id.

On August 27, 2007, MacLeod visited Dr. Hsu to discuss her
severe depression.  She was tearful during the visit, and Dr. Hsu
noted that her current medication was inadequate to control her
pain, which was "9/10."  Id. at 266.  He prescribed further
medications for insomnia and indicated that he would consider
treatment for depression at her next visit, in one month.  Id.

During her September 28 visit, Dr. Hsu noted that her pain
was improved, although still "7/10," and she was more optimistic
about the future.  Id. at 243.  They discussed that she might try
to return to work for thirty hours a week.  Id.  Dr. Hsu
encouraged MacLeod to pursue employment because it could help
with her depression.

By October 29, MacLeod's pain had dropped to "6/10," and she
was scheduled for a vocational rehabilitation assessment on
November 8.  Id. at 245.  Dr. Hsu noted that her pain control was
optimized, that she walked more quickly, and that she did not cry
during the exam.  Id.

On November 26, however, he wrote that MacLeod's pain
"increased with increased activities of looking for a job."  Id.
at 202.  She was "more tearful due to the realization that

7

employment is not likely realistic due to her limitations."
Paradoxically, he also wrote that she was "[n]ot tearful
throughout this exam."  Id. at 202.  He indicated that she
"ambulates with a straight cane with no loss of balance," but he
also handwrote, "Looking for work.  Walk without cane."  Id. at
202-03.

B.   Benefit Determinations

        MacLeod applied for disability benefits from Reliance
Standard and included a physician statement dated June 11, 2007,
from Dr. Hsu.  He stated that during an eight-hour work day with
two breaks and lunch, MacLeod could not sit, stand, walk, or
drive.  The benefits claim indicated that MacLeod had "no work
capacity at present."

        MacLeod's application also included an "Employer's
Statement," completed by ENTS's practice administrator on May 23,
2007, which evaluated the physical and intellectual demands of
MacLeod's position as a pre-certification coordinator at ENTS.
Id. at 370-73.  It stated that the position required standing,
walking, stooping, kneeling, crouching, and crawling up to one-
third of the time, as well as sitting and lifting or carrying
less than one pound between one-third and two-thirds of the time.
Id. at 372.  According to the practice administrator, the pre-

8

certification coordinator position could not be modified to accommodate MacLeod's disability, either temporarily or permanently.  Id. at 373.

Under the LTD policy, MacLeod was considered a "Class 2" employee, for whom "Total Disability" was defined as: "(1) during the Elimination Period and for the first 24 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her Regular Occupation."[5]  Furthermore, "Total Disability" included "Partial Disability," which meant that, due to injury or sickness, the Insured could either perform all the material duties of his or her Regular Occupation part-time, or some of the duties full-time.  "Regular Occupation" was defined as "the occupation the Insured is routinely performing when Total Disability begins.  We will look at the Insured's occupation as it is normally performed in the national economy, and not the unique duties performed for a specific employer or in a specific locale."

Reliance Standard informed MacLeod on August 6, 2007, that she was totally disabled within the meaning of the LTD policy. She was told she would receive benefits for the period beginning

_____

[5]No benefits are paid during the ninety-day Elimination Period.  Because MacLeod's disability was determined to begin on February 7, 2007, when she stopped working, her benefits did not begin to accrue until May 8, 2007.

May 8, 2007, and ending July 8, 2007.  Id. at 286-87.  The company told MacLeod, however, that it required additional medical documentation from her treating physicians in order to determine whether she remained disabled after July 1, 2007.  Id.

On November 28, 2007, David Lembach, a vocational rehabilitation specialist, prepared a report stating that MacLeod "was employed as an Insurance Clerk, Dictionary of Occupational Titles (DOT)," and that an Insurance Clerk "verifies hospitalization insurance coverage, computes patients' benefits, and compiles itemized hospital bills."  Id. at 235.  Although "Insurance Clerk" was not MacLeod's actual title, Lembach explained that "[t]he occupational title chosen most accurately reflects the duties of the occupation as described by the employer and claimant."  Id.

Lembach listed six tasks for which Insurance Clerks are responsible, and stated that it is a "sedentary exertion occupation" that requires occasional lifting, carrying, pushing, or pulling ten pounds.  Id.  He also reported that the occupation requires mostly sitting, but some standing or walking for brief periods, and that reaching, handling, and fingering are frequently required.  Id.  The only medical evidence Lembach reported reviewing was a statement from a Reliance Standard nurse: "Medicals support sedentary with the ability to alter

10

position."  Id.; see also id. at 81.  Lembach concluded that, in

his experience, "while this occupation involves a significant

amount of sitting[,] there is ample opportunity in a typical work

setting to alter position as needed.  Thus . . . the claimant is

able to perform the tasks of Insurance Clerk."  Id. at 235.

On December 10, 2007, Dr. Hsu completed a Physical

Capabilities Questionnaire at Reliance Standard's request.  He

stated that, on a regular basis in an eight-hour workday, MacLeod

could sit occasionally ("33% or less"), use foot controls

occasionally, and drive occasionally.  Id. at 218.  According to

Dr. Hsu, she could not stand, walk, bend at the waist, squat at

the knees, climb stairs or ladders, kneel, or crawl at all.  Id.

On December 27, 2007, Reliance Standard sent a letter to

MacLeod stating that she was no longer eligible for LTD benefits.

The letter said that the company had reviewed "all of the

information in [her] claim file, including (but not limited to)

the information provided by Dr. Hsu."  Id. at 208.  The letter

emphasized Dr. Hsu's notes on October 29 and November 26, which

said that pain control was optimized and that there were no

impairing side effects of the medication.  Id.  The letter

explained that Dr. Hsu's completed questionnaire "does not appear

supported by the records regarding the sitting limitations."  Id.

The denial was also based on the vocational rehabilitation review.  Id. at 209.

In the denial letter, Reliance Standard informed MacLeod that she could request a review of the determination within 180 days, but that only one review would be allowed.  Id.  She could, however, bring a civil action under ERISA following a denial of her appeal, and could complain to the New Hampshire Insurance Department.  Id.  Benefits were terminated as of December 31, 2007.  Id.

MacLeod appealed the denial of benefits at the beginning of March, 2008.[6]  Reliance Standard obtained an independent peer review report from Dr. Howard Choi, who is board certified in physical medicine and rehabilitation, on March 23, 2008.[7]  Id. at

_____

[6]Although the Joint Statement says that MacLeod appealed on or about March 5, 2007, the initial denial was made in December, 2007.  Reliance Standard's Claims Department sent a letter, dated March 4, 2008, acknowledging her letter requesting a review. Therefore, the court assumes that the Joint Statement contained a typographical error, and was intended to say "on or about March 5, 2008."

[7]Dr. Choi's statement regarding conflicts of interest was that he "ha[d] no relationship or affiliation with the beneficiary of this independent review or a significant past or present relationship with the Attending Provider and/or the treatment facility."  AR at 171.  Furthermore, he "ha[d] no direct or indirect financial incentive for a particular determination or ownership interest of greater than 5% between any affected parties."  Id.  Dr. Choi is certified by the American Board of Independent Medical Examiners.  Id. at 173.

171.  Dr. Choi reviewed 127 pages of records, including reports from October 11, 2006; January 11, March 14, July 9, July 20, August 13, and December 10, 2007; and January 16, 2008.  Id. at 170-71.  He concluded that MacLeod's records supported limitations on frequent walking, standing, bending, and squatting, and that her narcotic medications restricted her from driving commercial vehicles, operating heavy machinery, and similar activities.  He opined that her hip was not fractured and that "[t]here is no objective basis for limitations or restrictions on sitting, use of the upper limbs, overhead activities, or other work activities up to a medium physical demand classification level."  Id. at 171.

On April 8, 2008, Reliance Standard notified MacLeod by letter that her appeal was denied.  The letter stated that the full claim file, including updated documentation from her doctors and her letter to them, was reviewed by their "Quality Review" unit.  Id. at 178.  The review was "conducted separately from the individual(s) who made the original decision to terminate benefits."[8]  Id.

His company, Medical Evaluation Specialists, was paid $866.25 for Dr. Choi's peer review.  Id. at 177.

[8]MacLeod contends that Reliance Standard's review of her appeal was not a "full and fair" one, as required by ERISA regulations.  Specifically, she points out that Reliance

13

Reliance Standard explained the bases of its decision, including: the definitions of "total disability" and "regular occupation"; September, 2006, nerve conduction studies with normal results; the October, 2006, x-rays and MRI that showed minimal degenerative changes and no fracture; Lembach's November, 2007, vocational review; the July, 2007, MRI that showed mild degeneration of the lower back bones; Dr. Beasley's determination that MacLeod was "not a candidate for spinal cord stimulator"; and the fact that her healthcare insurance carrier approved twenty-five physical therapy visits but that she only went to one. The letter also quoted Dr. Choi's opinion at length.

Reliance Standard went on to point out that "the correspondence Dr. Hsu submitted on your behalf as part of this appeal is not consistent with spontaneous information in the claim file from that medical provider." Id. at 181. Specifically, his office notes from October and November, 2007,

_____

Standard's "Medical Department" was consulted both by the person in the Claims Department who initially denied the claim and the senior benefit analyst in the Quality Review Department who denied her appeal. The relevant provision requires only that the review be conducted by a fiduciary who "is neither the individual who made the adverse benefit determination . . . nor the subordinate of such individual." 29 C.F.R. § 2560.503-1(h)(3)(ii). MacLeod does not point to any provision that prevents the reviewing fiduciary from discussing the claim with medical staff who also analyzed the initial medical record. Moreover, she presents no evidence that the same individuals within the Medical Department were consulted at both stages.

14

and January, 2008, indicated that MacLeod's pain control was optimized and that she could walk with a cane without loss of balance, but his January 21, 2008, letter to Reliance Standard said that MacLeod was "unable to walk or sit." Id.[9] Given the inconsistencies, Reliance Standard felt that Dr. Hsu's assessment of MacLeod's physical capabilities was "at the very least, unconvincing." Id. at 182.

The denial letter reiterated that MacLeod could sue under ERISA or complain to the New Hampshire Insurance Department. Id. at 183. MacLeod took the advice: she filed this suit on March 31, 2009.


Standard of Review

The parties agree that Reliance Standard is the "claims review fiduciary" of the insurance plan at issue, and that the company "has the discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits. . . . [which] shall be complete, final and binding on

---

[9]The denial letter referred to the letter from Dr. Hsu as being written on January 16, 2008. A review of the record reveals that this quote was in fact taken from a January 21, 2008, letter. See AR at 196.

all parties."[10]  Joint Statement at ¶ 10.  Therefore, Reliance Standard's decision regarding eligibility will be upheld "unless it is arbitrary, capricious, or an abuse of discretion." Cusson v. Liberty Life Assur. Co. of Boston, No. 08-2381, 2010 WL 118384, at *7 (1st Cir. Jan. 14, 2010) (quotations omitted).

Under that standard, the court "inquire[s] into whether [the fiduciary's] decision was reasoned and supported by substantial evidence." Medina v. Met. Life Ins. Co., 588 F.3d 41, 45 (1st Cir. 2009).  "Evidence is substantial if it is reasonably sufficient to support a conclusion." Stamp v. Met. Life Ins. Co., 531 F.3d 84, 87 (1st Cir. 2008) (internal quotation marks omitted).  The decision will be affirmed, therefore, "if there is any reasonable basis for it." Medina, 588 F.3d at 45 (internal quotation marks omitted).  On the other hand, if the fiduciary's denial of benefits was based on "faulty reasoning and mischaracterization of the evidence[,] [it] will not survive an 'arbitrary and capricious' standard of review simply because some evidence in the record supports the ultimate conclusion."

---

[10]The parties dispute whether Reliance Standard is the "plan administrator," but this fact is immaterial.  For purposes of determining the standard of review, the focus of the inquiry is the "discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Wallace v. Johnson & Johnson, 585 F.3d 11, 14 (1st Cir. 2009).  Such authority may be given to "the administrator or [a] fiduciary." Id. (emphasis added).

McGahey v. Harvard Univ. Flexible Benefits Plan, Civ. No. 08-
10435-RGS, 2009 WL 4729660, at *7 (D. Mass. Dec. 11, 2009)
(citing Buffonge v. Prudential Ins. Co. of Am., 426 F.3d 20, 30-
31 (1st Cir. 2005)).

Where, as here, the same entity both determines eligibility
for benefits and pays those benefits, it is considered to have a
structural conflict of interest.  See Met. Life Ins. Co. v.
Glenn, 128 S. Ct. at 2343, 2348 (2008); Cusson, 2010 WL 118384,
at *6.  The existence of a structural conflict of interest
"should be weighed as a factor in determining whether there is an
abuse of discretion."  Met. Life Ins. Co., 128 S. Ct. at 2350
(quotation marks omitted).

"[U]nder certain circumstances, [that conflict can] be
accorded extra weight in the court's analysis."  Cusson, 2010 WL
118384, at *8.  "The conflict of interest at issue . . . should
prove more important (perhaps of great importance) where
circumstances suggest a higher likelihood that it affected the
benefits decision."  Met. Life Ins. Co., 128 S. Ct. at 2351; see
also Cusson, 2010 WL 118384, at *8.  On the other hand, "[i]t
should prove less important (perhaps to the vanishing point)
where the administrator has taken active steps to reduce
potential bias and to promote accuracy."  Met. Life Ins. Co., 128
S. Ct. at 2351.  MacLeod "bears the burden of showing that the

17

conflict influenced [Reliance Standard's] decision."   <u>Cusson</u>,
2010 WL 118384, at *8.


<u>Discussion</u>

MacLeod argues that Reliance Standard's denial of her claims
should be reversed because it was arbitrary and capricious.  She
contends that Reliance Standard "cherry picked" evidence to deny
her claim, and ignored substantial evidence that supported it.
According to MacLeod, Reliance Standard also failed to consider
her other chronic conditions, the fact that her pain could not be
adequately controlled, and the fact that she was taking narcotic
pain medications and experiencing side effects.  She also
maintains that there was a structural conflict of interest that
influenced Reliance Standard to make a biased determination.
Reliance Standard argues that there was ample evidence to support
its denial, that its denial was reasonable, and that there is no
evidence of bias in the Administrative Record, so therefore the
structural conflict of interest "tie-breaker" is unnecessary.


A.   <u>Evidence in the Administrative Record</u>

As discussed above, MacLeod visited a number of physicians
over the course of several months, all of whom noted her severe
pain and acknowledged that there was a physical basis for that

18

pain.  In October of 2006, Dr. Hsu diagnosed minimal degenerative changes.  In January of 2007, Dr. Tomek reported that MacLeod had mild to moderate degenerative changes.  In February, Dr. Tomek said she was unable to work and recommended surgery to remove a bony protuberance, which was never completed.  In July, Dr. Hou diagnosed mild degeneration of the lower back bones, and kidney and liver cysts.  Dr. Beasley confirmed that there was hip pathology and that MacLeod's physical capabilities were limited.

### 1.   Dr. Choi's Peer Review

In its final denial, Reliance Standard said that it reviewed her full file, although the only medical professional it identified as having reviewed the file was Dr. Choi.  Dr. Choi's report summarized much of MacLeod's medical record but contained some mistakes and overlooked many significant portions.  For example, Dr. Choi stated that she underwent the procedure to remove the bony protuberance, when in fact she had not.  Dr. Tomek recommended this procedure and said that MacLeod could not work until it was completed, and Dr. Beasley later recommended that MacLeod reconsider surgery.  Dr. Choi seems to have thought that the surgery was completed, which may have influenced his determination that MacLeod could work.  This error undermines the reliability of Dr. Choi's analysis.

19

In addition to that mistake, Dr. Choi also emphasized those portions of the treating physicians' reports that would support his finding "no objective basis for" limiting MacLeod's physical activities up to a medium level, and did not cite those portions that suggested otherwise.  For instance, after reviewing Dr. Hsu's notes from October 11, 2006, Dr. Choi wrote simply that MacLeod's range of motion and strength were full, but he neglected to mention the knee buckling, falling, and muscle spasms.  Dr. Choi referred to Dr. Tomek's January, 2007, finding that MacLeod had a stable gait and normal balance, but Dr. Choi omitted Dr. Tomek's diagnosis and his note that MacLeod's pain had not been controlled.  His peer review also left out Dr. Beasley's analysis of MacLeod's limited physical capabilities.

    2.    Reliance Standard's Determination

    Reliance Standard is correct that, where different doctors offer different views, the plan fiduciary has discretion to make a reasonable choice between those views.  Vlass v. Raytheon Employees Disability Trust, 244 F.3d 27, 32 (1st Cir. 2001).  In addition, the plan fiduciary need not explain why reliable evidence is credited despite its conflict with the opinions of treating physicians.  Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003).  Opinions of treating physicians, as

opposed to reviewing physicians, are not entitled to special deference.  Richards v. Hewlett-Packard Corp., No. 08-2538, 2010 WL 157480, at *7 (1st Cir. Jan. 19, 2010).  On the other hand, the plan fiduciary "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."  Black & Decker Disability Plan, 538 U.S. at 834.

Here, Dr. Hsu reported multiple times, over more than a year, that MacLeod was experiencing severe pain and could barely walk or sit, both of which are required in the position of insurance clerk.[11]  Reliance Standard chose to discount Dr. Hsu's analysis of MacLeod's physical capabilities because one of his reports stated that MacLeod could walk with a straight cane, while another stated that she was unable to walk or sit.  While this might appear contradictory, Reliance Standard failed to

---

[11]MacLeod argues that Reliance Standard should have considered the Employer's Statement section of her claim, as well as the fact that ENTS's description of her job differed from Lembach's description.  Under the terms of the LTD policy, however, eligibility for benefits was based on "the Insured's occupation as it is normally performed in the national economy, and not the unique duties performed for a specific employer or in a specific locale."  Therefore, ENTS's description of MacLeod's duties in her position as a pre-certification coordinator were irrelevant.  Lembach analyzed whether MacLeod could perform the duties of an Insurance Clerk, which was the generic occupation that was most similar to MacLeod's duties at ENTS.  Under the terms of the LTD policy, this was the appropriate approach.

consider the fact that the report of walking with a cane was
referring to Dr. Hsu's impression of MacLeod at one office visit,
whereas his statement that she could not walk or sit was made in
the context of telling Reliance Standard that she was "presently
unable to work."  AR at 195-96.  The ability to walk for a short
period with a cane is not the same as the ability to walk and sit
for long periods during an eight-hour workday in a sedentary
occupation.  Moreover, Dr. Hsu's statement that pain control was
optimized -- a fact that Reliance Standard cited in both its
initial and final denials of MacLeod's claim -- is not
necessarily inconsistent with his statements that her pain was
severe, that she could not walk or sit, and that she was unable
to work.  The fact that Dr. Hsu encouraged her to look for work
to improve her mental health also does not contradict his
physical capabilities assessment.  Given that Dr. Hsu's
statements were not contradictory, it was unreasonable to
consider them unconvincing.

     Not only should Reliance Standard have given more weight to
Dr. Hsu's reports, but it also should have given less to Dr.
Choi's.  As discussed above, Dr. Choi's report was cursory and
contained errors.  Moreover, Reliance Standard should have been
skeptical of Dr. Choi's conclusion that MacLeod was capable of
working at a "medium physical demand classification level," since

Reliance Standard's Medical Department and claims analysts had determined that the appropriate level was "sedentary." Id. at 171.

MacLeod's claim file contained reports of numerous treating physicians who diagnosed various hip problems, including a bony protuberance that should have been surgically removed.  The doctors also noted pain levels in the range of six to ten out of ten, and Drs. Hsu, Tomek, and Beasley all made reference to her limited physical capabilities.  Even if Dr. Hsu's report was "unconvincing," Reliance Standard should have given more credence to the other doctors' reports and less to Dr. Choi's.

B.   Structural Conflict of Interest

Both parties acknowledge that a structural conflict of interest exists, but there is scant evidence of how much weight it should be accorded.  As discussed above, the structural conflict of interest is a factor to be considered in determining whether Reliance Standard's denial was arbitrary, capricious, and an abuse of discretion.  The weight of that factor can be increased or decreased, but if it is to be increased, MacLeod bears the burden of showing that the structural conflict actually influenced Reliance Standard's decision.

The Supreme Court outlined the types of evidence that the parties should use in arguing the weight of a structural conflict.  It will be deemed more weighty "where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration."  Met. Life Ins. Co., 128 S. Ct. at 2351.  On the other hand, the weight is diminished "where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits."  Id.; see also McGahey, 2009 WL 4729660, at *8 (explaining that other relevant circumstances include "the thoroughness and consistency of the explanation of the denial; the care with which the claimant's own physician's opinions were treated; and, if the administrator relied on the opinion of independent experts, the extent to which these experts were in fact truly independent") (citations omitted).

In support of her argument that the structural conflict biased Reliance Standard's decisionmaking, MacLeod points to an entry in the claim diary log report that "SS offset does not apply," and argues that this shows that Reliance Standard was

24

improperly considering the financial impact of their
determination, presumably because Reliance Standard would be able
to recover Social Security benefits if they were awarded to
MacLeod.  AR at 40.  MacLeod also contends that Reliance Standard
representatives first decided to deny her claim, then attempted
to find evidence to support their decision not only by looking in
MacLeod's medical records but also by "googling" her and her
husband.  Finally, MacLeod suggests that the evidence showing
that Reliance Standard's decision was arbitrary also supports a
finding that it was biased.

Reliance Standard counters that the note about Social
Security was made shortly before MacLeod's claim was initially
approved, which shows that the later denials were not biased by
an improper financial consideration.  Furthermore, according to
Reliance Standard, the very fact that the claim was initially
approved shows that there was no bias.

None of these arguments is convincing.  Just because
Reliance Standard initially approved the claim does not show that
the later denials were not motivated by inappropriate financial
concerns.  On the other hand, simply because someone within
Reliance Standard considered whether to advise MacLeod to seek
Social Security does not prove that the claims analysts were

concerned about the costs to their company of approving her claim.

Because MacLeod did not meet her burden of showing that the structural conflict of interest ripened into anything more, the conflict factor retains some weight but is not accorded any additional weight for bias.  There is also no evidence that Reliance Standard made special efforts to separate those individuals within the company who handled finances from those who handle claims.  Therefore, the weight of the conflict factor is also not lessened.


C.   Weighing the Factors

MacLeod's claim was supported by substantial evidence from multiple doctors who consistently reported that she had limited physical capabilities.  Reliance Standard's decision was based primarily on Dr. Choi's peer review, which the company credited without question, despite its flaws.  Reliance Standard also exhibits a structural conflict of interest which, although not dispositive, remains a factor in the court's analysis.  Given these elements, Reliance Standard's denial of MacLeod's claim was not "supported by substantial evidence." Medina, 588 F.3d at 45. Reliance Standard should have paid MacLeod's benefits for the 24-month period in question.  See AR at 10.

26

D.   Attorney's Fees & Costs

     In an ERISA action such as this, "the court in its
discretion may allow a reasonable attorney's fee and costs of
action to either party."  29 U.S.C. § 1132(g)(1).  The First
Circuit applies a five-factor standard to determine whether fees
and costs should be awarded:

> (1) the degree of bad faith or culpability of the
> losing party; (2) the ability of such party to
> personally satisfy an award of fees; (3) whether such
> award would deter other persons acting under similar
> circumstances; (4) the amount of benefit to the action
> as conferred on the members of the [benefits] plan; and
> (5) the relative merits of the parties' positions.

Gray v. New England Tel. & Tel. Co., 792 F.2d 251, 257-58 (1st
Cir. 1986); see also McGahey, 2009 WL 4729660, at *10.

     The facts of this case were close, which make it unlikely to
confer much benefit upon other members of the LTD plan.
Moreover, Reliance Standard displayed no bad faith.  Therefore,
the court finds that attorney's fees and costs are inappropriate
in this action.


E.   Pre- and Postjudgment Interest

     It is within the court's discretion to grant prejudgment
interest on MacLeod's claim.  See Pacific Ins. Co. v. Eaton Vance
Mgmt., 369 F.3d 584, 590 n.8 (1st Cir. 2004) (quotation marks
omitted).  Ordinarily, the interest accrues "when a fiduciary

denies a participant's benefits." Id. "Setting the accrual date in this manner not only advances the general purposes of prejudgment interest but also serves ERISA's remedial objectives by making a participant whole for the period during which the fiduciary withholds money legally due. . . [and] prevents unjust enrichment." Id. Prejudgment interest is "available, but not obligatory." Janeiro v. Urological Surgery Prof. Ass'n, 457 F.3d 130, 145 (1st Cir. 2006) (quotation marks omitted).

While the availability of prejudgment interest is clear, the appropriate rate of interest is not. Generally, "federal law governs the scope of remedies available when a claim arises under a federal statute, and this doctrine extends to the rate of prejudgment interest." Cottrill v. Sparrow, Johnson & Ursillo, Inc., 100 F.3d 220, 224 (1st Cir. 1996) (citation omitted). MacLeod's claim arose under ERISA, which is silent with regard to the prejudgment interest rate. In such a circumstance, "courts have discretion to select an appropriate rate," and they should be guided by principles of equity. Id. at 224-25.

Postjudgment interest is available at the federal rate, pursuant to 28 U.S.C. § 1961(a). See Cottrill, 100 F.3d at 224. Postjudgment interest accrues as of the date that the amount of damages is resolved. Radford Trust v. First Unum Life Ins. Co. of Am., 491 F.3d 21, 24 (1st Cir. 2007).

28

In this instance, prejudgment interest is appropriate.  Had Reliance Standard properly allowed MacLeod's claim, the interest on the benefits would have belonged to her.  There is no reason why this should not be the case now.  Here, Reliance Standard stopped paying benefits on December 31, 2007.  Accordingly, interest began to accrue on January 1, 2008.

The parties do not address the appropriate rate for an award of prejudgment interest, and the court has an insufficient basis on which to exercise its discretion on this issue.  In order to facilitate this determination, the parties shall state the appropriate prejudgment interest rate in their future filings, as addressed below.

Postjudgment interest will be available at the federal rate, as of the date when the sum owed to MacLeod is determined.

Conclusion

For the foregoing reasons, MacLeod's motion for judgment on the administrative record (document no. 12) is granted in part, but the request for attorney's fees is denied.  Reliance Standard's motion for judgment on the administrative record (document no. 13) is denied.

The parties are directed to submit a joint proposed final judgment outlining the benefits owed to MacLeod, including

29

prejudgment interest at the appropriate rate, through the date of the proposed judgment.  If the parties cannot agree, MacLeod shall file a motion for entry of judgment **on or before March 15, 2010**.  Reliance Standard shall file an objection **on or before March 25, 2010**.


        SO ORDERED.


                                    _____
                                    Joseph A. DiClerico, Jr.
                                    United States District Judge

February 18, 2010

cc:  Christopher P. Flanagan, Esquire
     Janine Gawryl, Esquire